Nott, J.,
delivered the opinion of the court:
The Supreme Court decided in the case of United States v. Joseph (94 U. S., 614), that the Act 30th June, 1834 (Rev. Stat., § 2118), does not extend to the Pueblo Indians of New Mexico; that they should not “be classed with the Indian tribes for whom the intercourse acts were made,” and that “ the tribes for whom the act of 1834 was made were those semi-independent tribes whom our Government has always recognized as exempt from our laws,” “ and in regard to their domestic government” left to their own rules and traditions; in .whom we have recognized the capacity to make treaties, and with whom the governments, State and N ational, deal, with a few exceptions only, in their national or tribal character, and not as individuals.” “ The Pueblo Indians,” the court says, “ if indeed they can be called Indians, have nothing in common with this class.” Their holding lands in common the court likens to “the Shakers and other communistic societies in this country.”
Alluding to the facts that thePueblos were citizens of Mexico, and that by the treaty of Guadalupe Hidalgo all citizens of Mexico who did not otherwise elect were to become citizens of the United States, the court declines to declare that they are citizens of the United States, deferring a decision upon that question until it shall be presented “in some case where the rights of citizenship are necessarily involved. But we have no hesitation,” the court adds, “ in saying that their status is not, in the face of the facts we have stated, to be determined solely by the circumstance that some officer of the Government has appointed for them an agent.”
In the present case it appears by the testimony of the claimant that the character of the defendant Indians, the Yumas, at the time of the alleged depredation, was as follows:
*174 “ Those Indians would do most anything like white persons to look out for me there, and as good Indians; and I put them in charge of the boat, and they looked out for me just the same as white men would.
“And you arranged and employed some of the Indians to take charge of your boat and put it in their charge?
“ Certainly.
“ Did you agree to pay them anything for it?
“ I did pay them long ago.
“ You hired them to do it?
“Yes; I did.”
The Commissioner of Indian Affairs, in his report for 1872, says:
“ These Indians number about 2,000, and inhabit the country near the mouth of the Colorado River and in the vicinity of Arizona City, and subsist by planting and by cutting wood for steamers plying on the river.”
General Howard, in a report to the Secretary of the Interior in 1872, says:
“ This tribe is scattered all along the Colorado River from its mouth to the vicinity of Fort Yuma.”
It does not appear that the Yumas have ever entered into treaty relations with the United States; that they have ever been recognized as having “a tribal character” or as having a “capacity to make treaties;” that they have ever had a tribal organization capable of entering into a treaty; that they are anything more than a race of quiet, inoffensive, self-supporting, industrious persons. The only action of the Government toward them, proposed or executed, so far as has been shown to the court, was in supplying them with a few agricultural implements, “to enable them to plant and raise crops during the present year, ” 1872. The counsel for the claimant avers that these Indians are classed by the Commissioner of Indian Affairs in 1872 under the head of “ Cape Yerde Agency (special) as Apache Yumas.” But the Supreme Court has said of a similar body of Indians: “We have no hesitation in saying that their status is not, in the face of the facts we have stated, to be determined solely by the circumstance that some officer of the Government has appointed for them an agent, even if we could take judicial notice of the existence of that fact, suggested to us in argument.”
Such being the character of the tribe, we turn now to the character of the transaction.
*175 Tbe evidence consists of tbe claimant’s own deposition, of tbe ex parte affidavits of four persons wlio witnessed tbe burning of tbe boat from tbe deck of a steamer wbicb was passing down tbe river, of a letter from an Indian agent wbo was a passenger on a steamer, and of tbe ex parte affidavits of tbe two Indians wbo were in charge of claimant’s boat. Tbe four affidavits narrate tbat tbe deponents saw “that said boat was on fire and rapidly being destroyed, and was destroyed thereby and each concludes with substantially tbe same averment, tbat “this affiant further states tbat some incendiary must have set this boat on fire, and be verily believes some member or members of tbe Yuma tribe of Indians did tbe deed, as tbat part of tbe country where tbe boat was is inhabited almost exclusively by said tribe.”
Tbe Indian agent says: “I witnessed tbe destruction of tbe boat from tbe steamer while coming up tbe river in August, 1872, and noticed its proximity to an Indian camp; but, tbe owner being tbe oldest white settler and always friendly to tbe Indians, I could not believe it was destroyed willfully by them. They admit now, however, that it was tbe result of carelessness. I consider tbe claim a just and reasonable one.”
“ Ackawamar on oath says that be belongs to tbe Yuma tribe of Indians;” “tbat about two years ago, tbe river being high, tbe boat broke loose and came down the river and was caught near tbe Indian camp.” “I know tbat tbe boat was burnt up by tbe Indians building fires alongside where she stranded as tbe water fell, and before they could get her away tbe Yumas burnt her, but I can not say wbicb ones.” “Joseyo on oath says tbat be belongs to tbe Yuma tribe of Indians.” “About two years ago, in high water, tbe boat broke áway and drifted down river to an Indian camp near Pilot Knob, where it was caught, and before they could get her away she stranded. The Yumas built fires near and about her, and she was burnt up. I don’t think they intended to burn her, bub when she got on fire they got frightened and ran off and let her burn.” These two Indian deponents were the employés of tbe claimant and in charge of the boat.
It is manifest tbat this evidence does not establish a malicious intent, and does not show such a condition of negligence as would establish a liability at common law for tbe destruction of tbe boat. Tbe Indians were on their own ground, and
*176 liad a right to build fires there. It does not appear that they knew that the boat was stranded, and it does not even appear with certainty that the fires were not kindled before the stranding of the boat. The admission of some unknown, nondesig-nated Ipdians to the conclusion of law that the burning “ was the result of carelessness” can not be considered.
Without passing upon the questions whether these Indians were citizens by virtue of the treaty of Guadalupe Hidalgo, and whether the accidental and unintentional destruction of property by Indians can be deemed a depredation within the intent of the statute, or the destruction of property by American Indians in Mexican territory (which is also a question in the case), the court is of the opinion that the evidence is insufficient under the statute or at common law to establish a liability either against the Indian defendants or the United States.
The judgment of the court is that the petition be dismissed.